May it please the court. I'm Clint Krislav on behalf of the same lead plaintiffs. Um, we are appealing Judge Davis's denial of class certification as against the Clifford Chance Law Firm. Um, I would like to reserve three minutes if I could for rebuttal. Um, after the rigorous analysis, Judge Davis denied cert, cert, to certify the class against Clifford Chance on the sole basis that Clifford Chance essentially was a non-signer of the 10-Q at issue. Um, this issue of attribution is the issue before this court. What test do you want us to use? Um, the SEC's test of creator is satisfactory. You mean like our old Klein vacated test? Pardon? The vacated case in Klein, is that what you want? Um, yes, but lest the court be concerned that we're going to drag in, here's, here's what we identify as the problem. The concern is that lawyers who are merely doing their job in advising clients should not find themselves undesirably subject to 10-B liability just because they advise their clients. Or the issue really is whether a lawyer, here what we would say is if you're at all concerned about your previous test, Mr. Healy has creator plus, that no he did not merely advise a client who was a troublesome client as to how they might um, word what they were doing. Um, this is different from the Refco case in which the lawyer is asserted to have papered over the client's fraud. Here what happened was that the, that the client after the DVI, after receiving Deloitte's letter. By the way, Refco was argued back in December, is that right? Yes, and they have not, no decision yet. Believe me, we check it maybe minutely if not hourly. Um, on October 11th, 2002, Deloitte delivered a letter to DVI identifying that there were material weaknesses in the internal controls and that they would have to be disclosed. And the company then drafted a disclosure um, and was very concerned because for a medical equipment finance company, which is basically a pump for paper and money, if they were not accurately reflecting the income that was coming in, and indeed this was a core problem, they were accruing income on notes that were not being paid, some much longer than 180 days. So that the internal control weaknesses were substantial and six months later that's what brought the company down. After being advised that the company would have to disclose this, and drafting a disclosure which did disclose this, they went to John Healy at Clifford Chance and said, here's what we have and here's what we intend to do. What Healy did was call it Creator Plus. He certainly made the statement that was put in the 10-Q, but in order to do that he had to concoct a new reality, a charade, that went as follows. What you will do is you will do an evaluation after the Deloitte letters date, but prior to the filing, in which your division managers will certify that they've done an evaluation and that the internal controls are effective at a date after the date of the Deloitte letter. And because the 10-Q only requires you to, at that point in Healy's view, to disclose changes in the internal controls, thus we have established a new reality, a new baseline, that says the internal controls, we looked at them last Saturday, they're effective, been no change. And it was because of that, it was only on that basis with those certifications. In fact, one certification, the division manager was so uncomfortable that signing it as an employee, he signed it as an internal consultant out of his unease. Clearly, nothing substantial had been done to make the internal controls effective. How do you get in under 10-B, 10-B-5-B, I should say, in any event, though? Did you plead that? It looks like you just pled A and C. Well, I don't think we identified it just as A and C. What we did do is we identified the facts. We had passed muster on the complaint, but at the class certification stage, which is where we are, the discussion is, could the class be certified? Did they rely on a statement that Clifford Chance made? But your language looks like A and C, to Judge Ambrose's point. I don't see the B. In fact, it looks almost expressly like A and C. It's like you lifted the language from A and C, but I don't see anything from B. Well, I think after, because the pleading was done prior to Stonebridge, Stonebridge said that secondary actors could be, secondary actors who commit primary violations could nonetheless be liable under 10-B. You know, Stonebridge may have certainly changed the way matters were pled thereafter, but we were past that point. We are on the, whether the class-wide reliance could be shown on a statement that Clifford Chance made. It looks like Stonebridge, what it's doing is saying, in effect, it's a warning, don't expand liability beyond, or that skirts aiding and abetting, I should say. Well, not skirts exactly, but what they did is- The implied right of action in Section 10-B continues to cover secondary actors who commit primary violations. And so we presume that the non-signer is a secondary actor. And so a secondary actor that commits a primary violation, in this case, making the statement- And in terms of, and that sort of was the leading question I asked you, in effect, what test do you want us to use? Why not use the Revco test by Judge Lynch, assuming that that is the test ultimately adopted by the Second Circuit when its opinion comes out? Revco is, the test, we would say, is the creator test. In other words, under that test, I would assume, the public needs to know, does it not? Who did it? Well, who was involved? No. The fact is, here, Clifford Chance made the statement. It's not like in Revco, Collins papered over a fraud that the company was engaged in. There's some sort of attribution to the law firm under Revco, don't you? You don't, under Revco, you need an attribution to an identified party. And why shouldn't we require that? Because merely making the, merely having a non-signer free of liability creates invites, an arbitrary bright line in civil cases that is so easy to, I mean, you will have in the law, the non-signed CEOs and lawyers. The interim argument counts both ways in this. Well, in this case, it's just a little different because here you have a fraud which was not the company's. This is, this wasn't a troublesome company that went to its lawyer and said, here's what we're doing, how can we describe that? And the creator test would say that a lawyer who then misdescribes or tells them how to misdescribe that, or drafts the statement, might be subject. So that assumes a remoteness test, the creator test? I would say an involvement, at the very least, wherever you draw the line, short of just black and white, signed, didn't sign. Healy is on the wrong side of that. Healy took a client who knew that they had a disclosure to make, drafted the disclosure, and he initiated the fraud, which would enable him to make the statement that was a fraud, even though it wasn't attributed, it wasn't attributed. So it sounds like the test you would like us to use is the Ninth Circuit test, substantial participation. Substantial participation, maybe I would call it creator plus. That substantial participation in the fraud plus making the statement is certainly sufficient to have Healy be on the wrong side of that, and to have every honest, well-intentioned, I mean, you have a whole slew of people who will say, if my client is defrauding the world, if I merely assist them in doing that, I'm not advocating that necessarily as the test. How does a lawyer give advice under those circumstances? Under those circumstances, the lawyer, I mean, one of the things that we point out is that a lawyer is not, I mean, the ethics rule essentially prohibits the lawyer from telling the client how to violate the law. And that is the thing that we really don't want to do. However, there will be, you don't want to have somebody who says, here's what you're doing. You can't advise people to artfully mislead. I mean, that's already, we're obligated not to do that. But for these purposes, it is certainly sufficient if you adopt a creator created the false statement. This is a false statement. This is a statement that the internal controls have not, are unchanged and are effective. It sounds like what you're asking us to do is to get very close to the aiding and abetting that was found not to be acceptable in Central Bank. Well, REFCO is, REFCO would say that aiding and abetting is drafting the documents for your client's fraud. Personally, I think Mr. Collins, the bizarre nature of REFCO is that Collins is going off to prison and he is responsible civilly to the individual investor in REFCO who is among the most astute investors there are, but is not responsible to the public at large who have maybe an ill-advised division of responsibilities. Nonetheless, all this court really needs to do, because it is a concern, you don't want to have every lawyer fearful of giving good, honest advice. But to Judge Sirica's point, and the interim cuts both ways, you want to adopt a creator plus scenario, and you have lawyers who, let's face it, we don't operate in a vacuum in the law, and lawyers will have nuanced opinions, there are shades of gray in what they do, and you're advocating for a situation where the burden, it seems to me, is going to be on the law firm under those circumstances to disprove that they did something wrong simply because they drafted something that is called into question. Can I answer that? Yes. Healy's situation is different. It isn't just that they drafted. The SEC's provision... I understand Healy's situation is different. I'm talking about the test that you want us to... The consequences of the test you're asking us to adopt. The consequences of the test are, you would have to show that the lawyer did something more than just draft a statement that might be considered wrong. If you have something more that involves the lawyer in the fraud and drafts the statement, makes the statement, then you have, I believe, the plus. If the lawyer is uninvolved in the wrong, but merely drafts a misrepresenting statement where the company has an independent... Remember, at this point, they had already fired their general counsel, so Healy was their only securities counsel. There's nobody else involved. Healy is well over that line. I understand you're unease with that, but it is something more, and we would have to find that in discovery, which is what we did. So the burden would be on us. And so if the idea here were the clients rather than Healy, but Healy drafted the documents... Then we have Boyd versus Kline, and we have REFCO. And in that situation, I believe that the lawyer should be liable. I believe that it is where the lawyer participates by making a false statement that there isn't an intervener, whether it be the existing general counsel who has control or something else. Where the lawyers run in the show, if the client commits the wrong, and the lawyer then just papers over by a knowingly misrepresenting statement, I don't think the lawyer's got the great equities in his behalf. It isn't... We are ethically required not to deceive. That is what we do. Thank you, Your Honor. You're right about that. Thank you very much, Mr. Crislin. Mr. Barinholtz. Good afternoon. Good afternoon, Your Honor. I'm Celia Barinholtz, and I represent Clifford Chance in this case. The panel asked a number of questions about what test this court should adopt for misstatement liability. We're obviously looking at this after Stonebridge and what the Supreme Court has said about primary and secondary liability and... And it doesn't foreclose liability for unattributed actors. There have been three theories of liability in this case. The first was the pre-Stonebridge scheme liability theory. The second theory of liability advanced by the plaintiffs in the district court was this so-called workaround theory. It was still a scheme liability theory, and the gist of the theory was that Clifford Chance came up with the idea to do this special audit, and that special audit gave the auditors and the company comfort in issuing a 10-Q, which stated falsely, according to plaintiffs, that the company's internal controls were effective. The district court properly rejected that theory under Stonebridge because, as a predicate for class certification, saying that you can't use the fraud on the market presumption for a theory such as that because all of the law firm's conduct was behind the scenes. It wasn't known to the public, and therefore, under Stonebridge, the plaintiff couldn't be said to have relied... Not known to the public or not attributed to... It wasn't known to the public because it was a conduct. It was supposedly this scheme to have this special audit that would make everyone comfortable issuing the 10-Q. Now that we're in this court... We're dealing here, aren't we, with the standard whether it's capable of proof at a later point in time. You say the 10-Q was accurate. Is that correct? We do say that. And you say that there was nothing that Clifford did that was actionable. Is that correct? We do say that. All right. They say the 10-Q wasn't accurate and that Clifford did participate in a scheme, if you will, that makes them susceptible to the claims that were made and that they presented sufficient testimony that does show that these things are capable of proof post-certification. Why not give them the opportunity to do that? Because they've waived these arguments, Your Honor. They never... They're not in the complaint. They are absolutely not in the complaint. But A and C, limit your answer to A and C. There is no claim in this complaint that Clifford Chance made misstatements. And there was no claim before the district court that Clifford Chance made misstatements. The claim in the district court was a scheme liability claim. Their argument is that Clifford Chance drafted documents that misled. That's the argument now. It wasn't the argument below. And the argument now is that... And what's worse is that the argument is that the statement that Clifford Chance allegedly drafted doesn't even say what plaintiffs say it says. But again, in searching for the right test, whether it be Clifford Chance or my old law firm, Richard's Leighton Finger, whatever it might be, at some point, the firm can do enough that liability can be attributed to it. And at what point is that? What is the line that we should draw? If this court is going to consider this claim, even though it wasn't presented below or ruled on below, the conduct here clearly doesn't approach the level that you need to have to make Clifford Chance liable as a primary violator. First of all, there's no evidence in the record. None that Clifford Chance drafted this statement. There is no evidence. Forget Clifford Chance. What's the test that you would... The test that we would say this court should apply is the bright line test that the Second Circuit has applied. Not the Second Circuit. You mean REFCO on appeal? The Second Circuit has applied a bright line test. And REFCO is applying that, applied that bright line test to very similar conduct because it involved a lawyer. But the bright line test is the test that we submit should be applied. And that's a test that says that if you didn't make the statement yourself or if it wasn't attributed to you, you can't be held liable. But the argument here, just to tease all of this out if we can, the argument is that Clifford Chance didn't just participate in a wrong, but it orchestrated how the wrong was to be perpetrated. In that context, I realize you're not conceding that, if that were true, why could there not be liability despite Stone Ridge? Well, if that were the theory, orchestration of wrong, that would be, I would think, a scheme liability theory. And perhaps there would be liability. But under Stone Ridge, you couldn't use the fraud on the market presumption because the market wouldn't have known of the conduct. And so you couldn't prove reliance, which you need to prove on a class-wide basis in order to have a class action. So maybe somebody could make a claim under those circumstances, but it couldn't be proved on a class-wide basis because Stone Ridge says that you can only use the fraud on the market presumption if the conduct is known to the public. Well, maybe I'm confused. The known to the public, they read the 10Q. What's, what else? Stone Ridge says you have to rely on the defendant's own conduct. If the defendant's own conduct is orchestration of something, and here that orchestration is alleged to be a special audit, the idea of a special audit. Are you saying identity has to be known as well? I'm saying that, I'm saying that in a scheme liability case, the conduct has to be made known, the allegedly wrongful conduct. And in a misstatement case, the statement has to be known to the public, and yes, it must be attributed to the defendant or else the market isn't relying on the defendant's own conduct as Stone Ridge required. So if, hypothetically, and I understand your point as to the facts in this case, if counsel rewrites a 10Q, makes a fraudulent statement in the 10Q, the 10Q is released, there's no attribution to a specific individual, is there potential liability post-Stone Ridge? There is no liability in a private right of action. The SEC obviously has its powers, the criminal authorities have their powers, but the Supreme Court has made very clear that the 10B private right of action is a very limited one, and yes, we would submit that there could be no 10B. But Stone Ridge dealt with people who allegedly, or entities that were colluding with the principles, didn't sign anything, clearly were operating sub rosa. This is different, isn't it, in the case of this case? Your Honor, no, I don't think it's different at all. In Stone Ridge, you have vendors who engaged in sham transactions with the company. In order to allow the company to disseminate certain information. To disseminate false financial statements. And now here we have counsel, we have an actor who, by at least the plaintiffs, prove for what they say they can prove, was intimately involved in reworking and issuing the 10Q. Well, that's not... Is there a difference? Well... Isn't there a difference? I don't think so. I don't think there's any difference. The conduct is not conduct that the plaintiffs know about. It's not conduct that the plaintiffs rely on. Ultimately... Is an SEC prosecution for a lawyer in this circumstance? Or a non-class action? If... Yes, yes. Now, you know, the Supreme Court is very clear that in Stone Ridge that you have to rely on the defendant's own conduct. And the Supreme Court's also very clear that issuing public statements is the company's business. That no matter who's working behind the scenes, ultimately it's the company that issues the statements and the company that's responsible for them. And this notion that lawyers are running the show is just... Is not the way the real world works. And it's not the way things worked in this case. And I do urge Your Honors to look at the record, because the record shows something very different than what Mr. Krizlov argued to you. The record, and it's a very meager one, but the record shows that the chief accounting officer of DVI drafted a statement. That he gave it to the law firm to take a look at. That he gave it to the accounting firm, Deloitte, to take a look at. That he revised the statement. He, the chief accounting officer, revised the statement after talking to his lawyers and talking to his accountants. That he then gave it to his people at DVI and said, take a look at it, see if you can enhance it. And when you're done, give it to the accounting firm and make sure they're okay with it. But you're arguing the alternative. You say the record really doesn't matter here because it wasn't publicly attributable to the counsel for the purposes of the class actions. I do say that. But I'm also saying that the reality of the evidence here is that the role this law firm played is the role that law firms play every day in dealing with clients. It provided some advice as to what a disclosure should say. The Supreme Court has said this is an area that requires certainty and it's an area that requires clear lines. That there are real costs to our system if, if, if. But doesn't, doesn't. The scope of life. Isn't all of that a factual matter that left for summary judgment? What in this. The attribution is not. I understand your argument on fraud in the market theory and reliance. I have a hard time, Your Honor, with the notion that it's something left for summary judgment. When it wasn't in the complaint and it's never been the subject of a motion to dismiss. I understand that. But the, the, what you've been arguing the last couple of minutes, it seems to me, go, go to the facts. And the merits. Yes. I mean, what I am arguing does go to the facts. It's what the facts show here. And I think what the facts show here is that the law firm here did what law firms do every day of the week. And that there's, there's a very clear concern on the part of the Supreme Court that there be very clear lines and that professionals know what's wrong and what's right. And that it be very clear where liability can fall. It's a slippery slope. Once, as the Supreme Court said, once you get into the aiding and abetting area, because it's not clear what substantial assistance is. And so too here with the, with the creator plus test or creator test. When is a law firm doing, just giving its best advice? Maybe it's wrong. Maybe it's not. A law firm doesn't have all the information about the company. And when is the law firm the creator? It's a very unclear area. And there's a real risk if this court goes down that line of having very ambiguous fact by, you know, case-by-case, fact-based determinations of liability. And that's exactly what the Supreme Court said in Stonebridge and in Central Bank that it didn't want to do because there are real costs to the system if it works out that way. Now, you know, there's, there, there are cases, I suppose this is not one of them, where what an aider and abetter does is so egregious it ought to be addressed. But, but there is a remedy there. It doesn't belong to private plaintiffs, but the SEC would have the ability in such a case to bring an action. So the public is protected by the fact that the SEC can act. And in the meantime, the securities industry is, is protected because the standards are clear. And the Supreme Court's been very, very clear that it wants it to be a very narrow area of liability under 10b, under 10b. And it wants it to be very, very clear. As I say, it's our position that the court doesn't need to address any of these issues in this case because they've been waived, because they were not presented. None of the arguments that, that are being made today in this courtroom were made in the district court. So ultimately, we would say the court doesn't need to wrestle with these issues in order to affirm the decision below because they weren't presented to the court below and therefore were waived. Good. Thank you. Great. Anything else? Thank you very much, Ms. Barinholtz. Thank you, Your Honor. Mr. Crislow? Thank you, Mr. Director. I mean, to pick up where we, you know, ended, which I guess is to some extent where we started, we were saying that some of the arguments weren't made. The complaint basically gives us back 10B5 A and C, or A and C, not B. The argument you make now about, you made, although we haven't talked about it, Model Rule Professional Conduct 4.1. I don't see, I didn't see that being made in the district court. That would be, in other words, if you were trying to do the affiliated UTE route. Right. That's, and that came after. But as part of Stone Ridge and finding out, figuring out where affiliated UTE, where there was a responsibility to speak. We did in the complaint, if you look at the complaint at paragraphs, the First Amendment complaint, paragraphs 559 through 562, 559 does mention 10B and 10B5 and Clifford's violation, Clifford violated Section 10B and Rule 10B5 in that it employed devices, engaged in acts, practices, and then at paragraph 562A, drafting and submitting to the SEC and the public, DVIs, 10Ks, and various 10Qs for the fiscal years 2000, 2001, 2002, which Clifford Chan's new contained material misstatements and omissions. They are not claiming unfair surprise the class certification stage. We allege these facts from it below without question. And Judge Davis clearly identified that in footnote 39 of his opinion. Sorry, I can leave my cards there for the moment, where he laid out what we were alleging that Clifford Chance had done. Yes. Was there any allegation that it made any untrue statement of a material fact or omitted the state of material fact necessary in order to make the statements made not misleading? In the complaint, I presume we did not. We didn't allege it specifically in that respect. And we did not identify that as the basis on which we would see class certification, but we're sort of a bit beyond the complaint at this stage. And among the different things that we could complain about Clifford Chance, we found this one thing would clearly merit class certification, even after Stonebridge. The idea that this is something that law firms do every day of the week, not merely drafting things for their client, but changing their client's facts to create a charade that was not true. The idea that there was no evidence, number one, is for Judge Davis to look at it with the right standard. But there was ample evidence, including the affidavit by Garfinkel, the CFO who has completed his time in federal prison, that it was only Healy's actions which did the work around that saved the company's existence at that time. And he didn't just participate. He orchestrated. He was not merely a participant. Stonebridge, the cable box companies. Sorry, can I continue for a minute? Let me ask my colleagues if they have any further questions. I think I think we're in good shape. We understand your position. The argument could I do one? Yeah, one point. This is conduct. They say it has to be conduct of the author. It has to be conduct of the violator. This is conduct. The creator does not need to sign his work. It is the creator Healy's conduct that we are complaining about. Understand. In fact, we would like to have a transcript of this argument as well. NASA both sides share in the costs. We thank you for excellent argument. We'll take the case under advice. Thank you. Thank you. Well done.